**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANDREW M. GALLEGOS, | Case No.: 1:17-cv-0227 - JLT |
| Plaintiff, | ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF ANDREW M. GALLEGOS |
| v. | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | |

Andrew M. Gallegos asserts he is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks judicial review of the decision to deny his application for benefits. Because the ALJ identified legally sufficient reasons for discounting the credibility of Plaintiff's subjective complaints, the administrative decision is **AFFIRMED**.

## PROCEDURAL HISTORY

Plaintiff filed his application for benefits on March 19, 2013, alleging disability beginning on October 5, 2012. (Doc. 10-6 at 2) The Social Security Administration denied the application at the initial level on July 16, 2013, and upon reconsideration on December 11, 2013. (*See generally* Doc. 10-4; Doc. 10-3 at 12) After requesting a hearing, Plaintiff testified before an ALJ on May 27, 2015. (Doc. 10-3 at 12, 36) The ALJ determined Plaintiff was not disabled and issued an order denying

benefits on August 7, 2015.  (*Id.* at 12-24)  When the Appeals Council denied Plaintiff's request for review on June 14, 2016 (*id.* at 2-4), the ALJ's findings became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

gainful employment.  *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

**A.  Medical Background and Opinions**

In August 2012, Plaintiff visited the emergency room at Madera Community Hospital, reporting he had pain in his hands.  (Doc. 10-8 at 48) Doctors diagnosed him with bilateral hand pain secondary to overuse and provided him a splint for his right hand.  (*Id.* at 51) The following month, Plaintiff continued to complain of pain in both hands.  (Doc. 10-9 at 8) Kevin Tiyaamornwong, PA-C, found Plaintiff had "[n]o induration of the writs, no erythema of the wrist, no warmth of the wrist, no nodules on the wrist, no malformation of the wrist, no disarticulation of the wrist, no deformity of the wrists, and all wrists joints [had] full range of motion."  (*Id.* at 9)  However, Plaintiff demonstrated "pain… at the extreme limits of the range of motion" and the "Phalen's maneuver showed hand numbness/tingling in the median neve distribution and Tinel's sign was positive."  (*Id.*)  Tiyaamornwong diagnosed Plaintiff with probable carpal tunnel syndrome and left lateral epicondylitis, and prescribed splints for Plaintiff.  (*Id.* at 9-10)

Plaintiff was rear-ended a motor vehicle accident on October 5, 2012, after which he began having back pain in the lumbar region.  (Doc. 10-8 at 14) He underwent x-rays of his lumbar spine on October 22, 2012.  (*Id.* at 17) Dr. Donald Blackford determined Plaintiff had "slight scoliosis" and "early degenerative changes [that were] most marked at the mid and lower levels."  (*Id.*)  Dr. Blackford opined Plaintiff had "components of degenerative disc disease at the L3 through L5 levels and to a lesser degree posteriorly at the L5-S1 level."  (*Id.*)

Plaintiff was referred to physical therapy, where he had an initial evaluation with Brent Privett, P.T., on November 29, 2012. (Doc. 10-8 at 14) Mr. Privett determined Plaintiff had "decreased strength and [range of motion] in his lumbar spine," which was "limited by pain." (*Id.* at 15) He also found Plaintiff also had "decreased muscle strength" in both legs, which was "likely contributing to his back pain." (*Id.*)

On December 7, 2012, Plaintiff reported his back was feeling "much better after therapy." (10-8 at 25) Later that same month, Plaintiff said his pain at best was a "2/10" and at the worst was a "7/10." (*Id.* at 33) Mr. Privett opined Plaintiff "made good progress towards his goals" on December 28, 2018. (*Id.*)

On January 7, 2013, Plaintiff reported that "things were going fine" with physical therapy, and he was seeking additional sessions. (Doc. 10-8 at 20) Mr. Tiyaamornwong found Plaintiff did not exhibit swelling or erythema in his lower back, but "exhibited tenderness on palpation … with light spasming." (*Id.* at 21) Plaintiff had a negative straight leg raise test and negative reverse straight leg raising test. (*Id.*) Mr. Tiyaamornwong found Plaintiff did not require an assistive device for ambulation. (*Id.*)

Plaintiff underwent an MRI on his lumbar spine taken on January 21, 2013. (Doc. 10-8 at 28, 85) According to Dr. Phillip Kim, Plaintiff had a "slight loss of lumbar lordosis." (*Id.*) He opined "[t]he most significant findings [were] at the L2-L3 level where there [was] a 3mm left paracentral broad-based disc bulge which is touching and may be compressing the ventral surface of the thecal sac." (*Id.*) Dr. Kim noted there was "no clear evidence of nerve root compression," but "there may [have been] some encroachment upon the left L2 nerve root." (*Id.*) Dr. Kim also found "small central disc bulges at L3-L4, L4-L5, and L5-S1," but found "no nerve root compression" at these levels. (*Id.*) Further, he determined Plaintiff had "mild multilevel degenerative changes possibly slightly out of proportion for the patient's age." (*Id.*)

On January 23, 2013, Plaintiff cancelled his physical therapy session and went to Madera Community Hospital for due to back pain. (Doc. 10-8 at 26, 72) At the hospital, Plaintiff described his low back pain as a "10." (*Id.* at 72) Plaintiff was treated with Hydromorphone and Dexamethasone (*Id.* at 75) and was discharged the same day at which time he described his pain as a "5." (*Id.* at 74) Plaintiff

received a prescription for Vicodin. (*Id.* at 74) Mr. Tiyaamornwong evaluated Plaintiff the following day, and noted Plaintiff had a positive straight leg raising test with the left leg. (Doc. 10-9 at 21) However, Plaintiff's reflexes and gait were normal, and Mr. Tiyaamornwong believed an ambulatory device was not necessary. (*Id.* at 21-22)

Plaintiff was discharged from physical therapy on February 1, 2013. (Doc. 10-8 at 33) According to Mr. Privett, Plaintiff "had made good progress… [but] then began to suffer increased pain and symptoms got worse than when he began therapy." (*Id.*) Mr. Privett noted Plaintiff described his pain as an "8/10" at best and "10/10" at the worst. (*Id.*) Plaintiff informed Mr. Tiyaamornwong that he was in a "great deal of pain" later that same month. (Doc. 10-9 at 23) Mr. Tiyaamornwong referred Plaintiff for a consultation with a pain management specialist on February 13, 2013. (*Id.* at 24)

Dr. Ho Kang performed a new patient evaluation for pain management and rehabilitation on March 6, 2013. (Doc. 10-10 at 35) "On a pain scale of 1-10, [Plaintiff said his] average pain remains at level 9." (*Id.*) Dr. Kang determined Plaintiff's motor strength was "4/5" in his legs, and his straight leg raise test was "limited to 55 degrees." (*Id.*) In addition, Dr. Kang observed that Plaintiff's walking on tiptoes and heels appeared "painful, slow." (*Id.*) Plaintiff demonstrated moderate tenderness "in the paraspinal muscles, gluteal region, lumbosacral junction, [and] sacroiliac joint." (*Id.*) Further, Dr. Kang opined Plaintiff's range of motion was moderately decreased in the lumbosacral spine with "flexion, extension, bilateral lateral bending, [and] rotation." (*Id.*) Dr. Kang directed Plaintiff "to do daily exercise programs" and prescribed non-steroidal anti-inflammatory, "muscle relaxant, analgesics and anti-anxiety medications." (*Id.* at 37)

On March 18, 2013, Plaintiff had a follow-up appointment with Mr. Tiyaamornwong, and reported that his pain had "not changed," and "some days [were] better than others." (Doc. 10-9 at 25)

Dr. Janardhan Grandhe performed a pain management evaluation on March 25, 2013. (Doc. 10-9 at 39) Plaintiff described his back pain as "constant, aching, sharp or stabbing, worse in the morning, worse in the evening, and worse since it began." (*Id.*) He also said that in the past week, his "average pain was 10 and worst pain was 10." (*Id.*) Dr. Grandhe found Plaintiff exhibited tenderness in his cervical spine, suprascapular area, thoracic spine, lumbar spine, facet joints, and sacroiliac area. (*Id.*) Plaintiff's "[u]pper and lower extremity range of motion [was] within normal limits." (*Id.*) However,

Dr. Grandhe determined Plaintiff had positive straight leg raise tests, and was "positive at 30 degrees on [the] left and 40 degrees [on] the right." (*Id.*) Dr. Grandhe "advised [Plaintiff] to continue TENS therapy to decrease intensity of pain" and provided a lumbar support back brace "for the support and stability of the spine." (*Id.*) In addition, Dr. Grandhe administered a bilateral occipital nerve blocks, bilateral suprascapular nerve blocks, and bilateral sacroiliac injections. (*Id.*) A few days after the injection, Mr. Tiyaamornwong observed that Plaintiff was "appear[ed] to walk normally" and was "able to get on and off the exam table and… recline and sit without assistance." (*Id.* at 28)

Dr. Ben Waldau performed a neurosurgical consultation on April 1, 2013. (Doc. 10-8 at 43) Plaintiff reported that he had "pain in his head, neck, shoulder, upper back, middle back, and lower back." (*Id.*) In addition, Plaintiff reported he has "some pain in his right leg above the knee and his left leg above the knee, but this is not as strong as his back pain." (*Id.*) Plaintiff described "his back pain as 9/10, his leg pain as 6/10, [and] his neck pain as 7/10." (*Id.*) Dr. Waldau found Plaintiff was "tender to palpation severely over his lower cervical spine and over his back," and "multiple trigger points over his back." (*Id.*) Plaintiff's strength was "5/5 … in his bilateral upper and lower extremities" and his reflexes were normal. (*Id.*) Dr. Waldau noted Plaintiff was scheduled to have epidural steroid injections and advised against them because Plaintiff did "not have any leg pain and no significant compression of his thecal sac on the MRI." (*Id.*) Instead, Dr. Waldau "recommend[ed] facet injections" because he believed the back pain was "probably due to osteoarthritis and lumbago." (*Id.*) Further, Dr. Waldau opined Plaintiff did not qualify for a neurosurgical operation, and Plaintiff's "mild coronal scoliosis … [was] not severe enough to warrant any intervention." (*Id.*)

On April 11, 2013, Karen Paolinelli, NP, evaluated Plaintiff to treatment of carpal tunnel syndrome. (Doc. 10-8 at 87-88) Plaintiff reported that he had the pain for six months and that his hands would "fall asleep at night and some times during the day." (*Id.* at 87) laintiff was directed to take the medications he had been prescribed. (*Id.* at 87) Plaintiff did not receive any restrictions for activities. (*Id.*)

At an appointment with Mr. Tiyaamornwong on April 17, 2013, Plaintiff reported that he was "doing fine" and his "back actually [had] been doing a little better," with no radiculopathy. (Doc. 10-9 at 31) Mr. Tiyaamornwong determined Plaintiff's "cranial nerves were normal, gait and stance were

normal, and the deep tendon reflexes were normal." (*Id.*) In addition, Plaintiff's straight leg raise tests were negative. (*Id.*)

On May 7, 2013, Plaintiff reported that his injections helped and he was "a little better in regards to his back pain," but he "still…[had] pain intermittently" and was in pain "for a couple days after injections." (Doc. 10-9 at 35) Plaintiff continued to exhibit a normal gait and stance. (*Id.* at 36) He informed Mr. Tiyaamornwong that his application for disability had been denied and requested forms be completed indicating his physical capacities. (*Id.* at 35) However, Mr. Tiyaamornwong indicated his office was "not equipped for such [evaluations]." (*Id.*)

Later in May 2013, Plaintiff told Dr. Grandhe that the nerve block injections provided "50% pain relief for almost a week, but then the pain returned." (Doc. 10-9 at 42) He described his neck pain and mid-back pain at a level "4-5/10," and "low back pain with radiating pain to lower extremities, left side greater than the right[,] with numbness and tingling rated at 7/10." (*Id.*) Despite this, Dr. Grandhe opined Plaintiff had a "good response from diagnostic bilateral lumbar facet joint block" as well as a "[a] good response from bilateral occipital nerve block and bilateral suprascapular nerve block." (*Id.*) Therefore, Dr. Grandhe repeated the nerve block injections, and planned to do "a diagnostic lumbar epidural steroid injection" two to four weeks later. (*Id.*)

Plaintiff re-started physical therapy in June 2013, and he had five sessions between June 18 and July 12, 2013. (Doc. 10-9 at 56)

Dr. C. Bullard reviewed the medical record and completed a physical residual functional capacity assessment on July 26, 2013. (Doc. 10-4 at 11) Dr. Bullard noted that Plaintiff was informed "no surgery was needed," and he should "just proceed [with] pain management & injections." (*Id.*) According to Dr. Bullard, "[t]he evidence support[ed] a light RFC with [occasional] posturals." (*Id.*) Specifically, Dr. Bullard concluded Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; sit about six hours in an eight-hour day; stand and/or walk about six hours in an eight-hour day; and occasionally climb rams, balance, stoop, knee, crouch, and crawl. (*Id.* at 9-10) Dr. Bullard opined that Plaintiff did not have any manipulative limitations, and had an unlimited ability to push or pull. (*Id.* at 10) Dr. Bullard believed Plaintiff should never climb ladders, ropes or scaffolds. (*Id.*) Plaintiff also needed to avoid concentrated exposure to "unprotected heights [and] heavy machinery."

(*Id.* at 11)

On August 9, 2013, Plaintiff told Mr. Tiyaamornwong that he was "a lot better" and the epidural injection he received "helped greatly." (Doc. 10-9 at 73) He said that "some days [were] better than[] others," but "on the whole [he felt] better." (*Id.*) Mr. Tiyaamornwong found Plaintiff did not exhibit any swelling or tenderness in his low back. (*Id.*) In addition, he observed that Plaintiff had a normal gait and stance, and he was "able to get on and off the exam table and … recline and sit without assistance." (*Id.*) The same date, Plaintiff "cancelled all further [physical therapy] appointments due to a lack of transportation." (*Id.* at 56, 57) Barbara Fee, P.T., noted Plaintiff "started feeling better with decreased pain from 8/10 to 5/10 indicating increased tolerance for therapeutic exercise and a good response to Physical Therapy." (*Id.* at 56)

On September 4, 2013, Dr. Grandhe noted that Plaintiff had "good and continued relief" from the prior epidural injections, "but still [had] low back pain with activity and numbness in the feet." (Doc. 10-9 at 90) Two days later, Plaintiff reported he was "[f]eeling much better" and his "pain never really [got] more than a 3-4/10." (*Id.* at 75) He informed Mr. Tiyaamornwong that he planned to have another epidural injection in October and believed it would "be his last because he [felt] much better." (*Id.*) Mr. Tiyaamornwong determined Plaintiff did not have any swelling; erythema; or tenderness in his lower back, cervical spine, and thoracolumbar spine. (*Id.* at 75-76) Plaintiff's straight leg test was negative, though he had "tightness to hamstrings." (*Id.* at 76) His gait and stance continued to be normal, and he could do both heel and toe walking. (*Id.*) Mr. Tiyaamornwong opined Plaintiff was "much improved." (*Id.*)

In October 2013, Plaintiff told Mr. Tiyaamornwong that he was "feeling pretty good" and was "continuing to get better." (Doc. 10-9 at 77) Plaintiff continued to report a decrease in pain the following month, describing it as "2-3/10 in the low back." (*Id.* at 91) Dr. Grandhe noted Plaintiff had "continued relief to date of more than 50%," though he had "discomfort persisting in [the] low back particularly on the right side with discomfort in [both] thighs." (*Id.*) Dr. Grandhe opined Plaintiff's response to the injections was "excellent" and released Plaintiff from pain management on November 21, 2013. (*Id.*)

Dr. Ian Occrant review the medical record on December 4, 2013, and affirmed the conclusion of

Dr. Bullard that Plaintiff retained the ability to perform light work with postural limitations. (Doc. 10-4 at 23) He also believed Plaintiff needed to avoid concentrated exposure to unprotected heights and heavy machinery. (*Id.*)

On December 10, 2013, Plaintiff reported that he was "doing okay," and "considering going back to work if he [was] denied social security." (Doc. 10-10 at 3) Mr. Tiyaamornwong found no swelling, erythema, or tenderness in Plaintiff's low back. (*Id.* at 4) He opined Plaintiff had no tenderness in the cervical and thoracolumbar spines, and the motion of his spine was normal. (*Id.*) Mr. Tiyaamornwong observed that Plaintiff's gait and stance were normal and he did not need an ambulatory device. (*Id.*) Plaintiff had a "mild positive" straight leg raise test with his left leg at 45 degrees. (*Id.*)

In January 2014, Plaintiff told Mr. Tiyaamornwong that "on the whole" he was doing "better," though the cold weather made his back feel "tight and cause[d] some pain." (Doc. 10-10 at 6) Plaintiff's straight leg raising tests were negative. (*Id.* at 7)

Dr. Shaikh Matin performed a consultative evaluation on February 11, 2014. (Doc. 10-10 at 22) Plaintiff described his back pain as an average of "8 out of 10." (*Id.* at 23) Dr. Matin opined Plaintiff had a full range of motion in his neck but Plaintiff had "guarding movements." (*Id.* at 24) According to Dr. Matin, Plaintiff was "not tender to palpation" in the cervical spine or neck muscles, but exhibited tenderness in the lumbar paraspinal muscles and guarding on rotation. (*Id.*) He also found Plaintiff had a decreased range of motion in the lower back due to pain. (*Id.*) Plaintiff had a positive straight leg raising test at 45 degrees elevation, "with increased pain at the [lumbosacral] area." (*Id.*)

Mr. Tiyaamornwong treated Plaintiff only two times due to back pain in 2014, in March and April. (Doc. 10-10 at 32) In March 2014, Plaintiff reported that the cold weather aggravated his back, but otherwise his "back had been fine." (*Id.* at 9) Mr. Tiyaamornwong found no swelling or erythema, but Plaintiff "exhibited tenderness on palpation…with some spasming" in the lower back. (*Id.* at 10) Plaintiff's "straight-leg raising test was positive mild." (*Id.*) His gait continued to be normal and his ability to ambulate was not limited. (*Id.*) Mr. Tiyaamornwong gave Plaintiff "[b]ody mechanics education," including information on self-massage and the application of ice and heat. (*Id.*) The following month, Plaintiff reported he had "[n]o new problems" and simply requested a medicine refill.

(*Id.* at 12)

Hector Aguilar, PA, evaluated Plaintiff in May 2014, when Plaintiff requested a referral to an eye doctor as well as a refill of his pain medication. (Doc. 10-10 at 14) Plaintiff reported his symptoms were "controlled" with the medication, and his pain was not radiating or causing an interference with his sleep. (*Id.*) Mr. Aguilar observed that Plaintiff did not have any stiffness in his back, he was "[a]ble to stand erect," and his gait was normal. (*Id.*) Further, Mr. Aguilar found Plaintiff did not have any tenderness in the cervical and thoracolumbar spines. (*Id.* at 15) Plaintiff's straight leg raising tests were negative. (*Id.*)

On May 29, 2014, Plaintiff went to the emergency room at Madera Community Hospital, complaining of back pain that he described as "8/10." (Doc. 10-10 at 64) He reported that he "missed [his] chronic pain clinic [appointment]" and ran out of Vicodin and Nubain. (*Id.*) In addition, Plaintiff acknowledged that he was using drugs, and identified marijuana and meth as his "drug(s) of choice". (*Id.*) Frank Bravo, a nurse practitioner, performed a musculoskeletal examination and found no tenderness or deformities. (*Id.* at 65)

Plaintiff had several images taken of his lumbar spine on August 6, 2014. (Doc. 10-10 at 58) Dr. Paul Loeffler determined Plaintiff had a "[m]oderate leftward mid lumbar scoliotic curvature." (*Id.*) He found "[n]o other significant degenerative changes or acute abnormalities." (*Id.*)

In November 2014, Plaintiff visited an emergency department, complaining of pain and swelling in his right hand. (Doc. 10-10 ag 54) He had demonstrated "deep tenderness at the base of the 2nd and 3rd metacarpals, and x-rays were taken. (*Id.* at 55) Dr. Richard Thistle opined that Plaintiff had "a well corticated 5 x 8 calcification" by the base of the metacarpals. (*Id.* at 53, 55)

Plaintiff began physical therapy again on February 25, 2015. (Doc. 10-10 at 28) He told Melissa Elford, P.T., that physical therapy "did help him," but he stopped doing his home exercise plan "because he was feeling better." (*Id.*) He also stated he stopped using his TENS unit after he "ran out of supplies." (*Id.*) Ms. Elford observed that Plaintiff had an impaired range of motion in his thoracic and lumbar spine, "decreased core strength[,] and impaired flexibility throughout his back and [legs]." (*Id.* at 29) She recommended Plaintiff receive physical therapy for twelve weeks, and this plan was approved by Dr. Kenneth Bernstein. (*Id.* at 30)

On April 1, 2015, Plaintiff visited a hospital emergency department, reporting that "he was getting therapy on his back and he felt his back go out." (Doc. 10-1 at 44) In addition, Plaintiff stated that "he [had] Norco and Motrin at home," but it was "not controlling his pain." (*Id.*) Upon examination, he exhibited "tenderness to the lower back with no obvious swelling or bruising or redness." (*Id.* at 45)

Mr. Tiyaamornwong completed an assessment of Plaintiff's condition on May 13, 2015. (Doc. 10-10 at 68) He noted Plaintiff's visits to his office varied in frequency, and ranged from one to four months. (*Id.*) According to Mr. Tiyaamornwong, Plaintiff had a limited range of motion, and limits with performing daily activities, prolonged standing, prolonged sitting, carrying items, and stooping. (*Id.*) He did not identify any limitations with walking or lifting. (*Id.*) Mr. Tiyaamornwong opined Plaintiff had a "slight improvement" in symptoms since he was first treated in October 2012. (*Id.*)

## B. Administrative Hearing Testimony

Plaintiff testified before the ALJ on May 27, 2015. (Doc. 10-3 at 36) He stated that he had an eleventh-grade education, and received most of his high school credits through the California Youth Authority. (*Id.* at 40) He reported his work history included working three to four months as a groundskeeper for Chowchilla Unified High School District, car washing for a couple years, and work through a temp agency at a farm. (*Id.* at 41-44) Plaintiff said he stopped working after he was in a car accident on October 5, 2012. (*Id.* at 45)

He believed he was unable to work because he had "severe back pain" in his lower back, neck pain, headaches, and carpal tunnel in his hands. (Doc. 10-3 at 47-48) Plaintiff described his back pain as "pulling, stretching, [and] tightening," which caused "sharp pain down []his leg and… ankle." (*Id.* at 47) He said the pain also put him "in an awkward position" where he was "leaning forward… all the time." (*Id.*) He explained it was "very painful to move," including standing and rising from a chair. (*Id.*) Plaintiff reported he could not bend over to pick up an item if he dropped it, and could only squat. (*Id.* at 49) In addition, he testified that he could not twist or turn because his back would "immediately go out." (*Id.* at 50) Plaintiff said the pain in his back was "at least a seven every day," but if he were to have an active day that required bending or standing for a long time, his back pain would increase to the point that he "wouldn't be able to do nothing the next day." (*Id.* at 51)

Plaintiff testified he also had occipital neuralgia, which caused headaches and neck pain.  (Doc. 10-3 at 51)  He said he had headaches "[a]t least two to three times a week."  (*Id.* at 52)  Plaintiff reported that to ease his pain, he would "try to relax," lay down, distance himself from his kids, and take medication such as Ibuprofen and Advil.  (*Id.*)  He explained the pain in his neck would come and go, but he would "wake up with it sometimes."  (*Id.* at 53)  He reported that on a bad day, if he drove, then he had to move his entire torso rather than his neck to look.  (*Id.*)

He also reported that he had carpal tunnel syndrome in both hands.  (Doc. 10-3 at 53)  Plaintiff said he had constant pain, "numbness throughout the day," and loss of sensation in his hands.  (*Id.* at 54)  Plaintiff stated that a doctor told him "they would do the surgery but [he] talked to a lot of people and they're not so sure that the surgery would really help."  (*Id.* at 53-54)  Plaintiff explained he did not "want to do a surgery that's not going to be guaranteed."  (*Id.* at 54)

Plaintiff said he had a primary care doctor, pain management doctors, and a physical therapist.  (Doc. 10-3 at 55-56)  He testified he attended physical therapy once a week, but tried to do exercises at home every day.  (*Id.* at 57)  In addition, he reported he visited a pain management physician "once a month."  (*Id.*)  He stated that he had a TENS unit that he used at home.  (*Id.*)

He testified that he "never really believed [he] had a really good memory," and had a "very short term memory."  (Doc. 10-3 at 65)  He reported he would "forget a lot of stuff," which he attributed to past drug use.  (*Id.*)  He stated he also had trouble paying attention and focusing.  (*Id.* at 66)  Plaintiff said he would "get really short tempered" with people, such as when he felt that he could not "communicate right with them sometimes…" and he was not grasping information.  (*Id.* at 66-67)

Plaintiff reported he did not "do too much walking," though stores such as Walmart and Save Mart were within walking distance of his home.  (Doc. 10-3 at 39-40)  He believed he could walk "[p]robably ten minutes" before he needed to sit, and he would "find somewhere to sit on some boxes… or inventory stuff" when he was tired of standing or walking at store.  (*Id.* at 67)  Plaintiff said he had "a couple of canes at home," which were not prescribed by a doctor, but he only used when "really need[ed]."  (*Id.* at 58-59)  He estimated that he used a cane "once a month" when his back went out.  (*Id.* at 59)

Plaintiff said that when sitting, he needed to "readjust [himself] every ten minutes."  (Doc. 10-3

at 68) He testified that he did not like to stand to do so "because it hurt[] to get up." (*Id.* at 69) Plaintiff stated he would not "lift more than ten pounds" because he did not want to "take the chance of having [his] back go out." (*Id.*) He explained his daughter weighed "probably only ten or 15 pounds" and after lifting her out of a car seat, he had to go to the hospital. (*Id.*) Plaintiff also said he did not "reach high" or "reach up," and would ask his wife to reach items. (*Id.* at 70) In addition, Plaintiff reported he did not bend, kneel, or crawl due to his back pain, but he could squat. (*Id.* at 70-71)

He stated he did some household chores, such as washing dishes and changing diapers. (Doc. 10-3 at 74-75) He did not do laundry or sweep. (*Id.* at 75) He estimated that he spent "four hours during the morning" lying down. (*Id.* at 79) In addition, Plaintiff reported that he went to church "every Sunday and Friday in Fresno," and each service lasted an hour and a half. (*Id.* at 76- 77) He said that if his back began to hurt too much during the service, he would go to the kids' room to check on his kids or go outside. (*Id.*)

## C.    The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the application date of February 26, 2013. (Doc. 10-3 at 14) At step two, the ALJ found Plaintiff's severe impairments included: "degenerative disc disease of the lumbar and cervical spine and bilateral occipital neuralgia." (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 14-15) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as described in 20 C.F.R. 416.967(b), except that he can occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. The claimant should avoid concentrated exposure to hazards, including moving machines and unprotected heights.

(*Id.* at 16) Based upon this RFC, the ALJ concluded Plaintiff was "capable of performing past relevant work as a poultry eviscerator … as generally performed in the regional and national economy." (*Id.* at 22) In addition, the ALJ concluded there were "other jobs existing in the national economy that he [was] also able to perform. (*Id.* at 22-23) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 24)

*///*

13

# DISCUSSION AND ANALYSIS

Plaintiff asserts the ALJ did not identify legally sufficient reasons to reject the credibility of his subjective complaints. (Doc. 17 at 2-12)  Defendant argues "[t]he ALJ properly found that Plaintiff's subjective description of his symptoms and limitations lacked appropriate record support." (Doc. 22 at 12)

## A.    Limitations to which Plaintiff Testified and the RFC

As an initial matter, the Court notes that Plaintiff fails to identify what subjective complaints and limitations addressed in Plaintiff's testimony that he believes should have been incorporated into the residual functional capacity by the ALJ.  Previously, the Ninth Circuit "reject[ed] any invitation to find that the ALJ failed to account for [the claimant's] injuries in some unspecified way" where the claimant failed to "detail what other physical limitations" he believed should have been included in the RFC.  *See Valentine v. Astrue,* 574 F.3d 685, 692 n.2 (9th Cir. 2009).

Likewise, district courts throughout the Ninth Circuit determined failure to identify specific limitations that should have been incorporated into a residual functional capacity is fatal to a claimant's challenge of the ALJ's findings.  *See, e.g.*, *Juarez v. Colvin*, 2014 U.S. Dist. LEXIS 37745 at *15 (CD Cal. Mar. 20, 2014) (rejecting an argument that the ALJ erred in evaluating the claimant's limitations where she had "not specified or proffered evidence of any additional limitations from the arthritis that the ALJ failed to consider"); *Hansen v. Berryhill,* 2018 U.S. Dist. LEXIS 19489 (W.D. Wash. Feb. 6, 2018) ("Although Plaintiff argues that the ALJ erred in failing to account for the limitations caused by his ADHD in the RFC assessment, he does not identify which limitations were erroneously omitted, and has thus failed to state an allegation of error"); *Thomas v. Comm'r of SSA*, 2015 U.S. Dist. LEXIS 99338 at *21 (Dist. Or. Jul 30, 2015) ("Plaintiff does not cite to evidence of physical limitations stemming from these impairments beyond those already listed in his RFC.  Without more specific information on how these conditions hinder Plaintiff, the Court declines to find the ALJ failed to account for Plaintiff's limitations").

The Court is unable to speculate as what limitations Plaintiff believes the ALJ should have incorporated into the RFC based upon Plaintiff's hearing testimony.  *See Valentine,* 574 F.3d at 692 n.2; *see also Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (noting the

Court "has repeatedly admonished that [it] cannot 'manufacture arguments for an appellant'").

Accordingly, Plaintiff fails to identify any error with the residual functional capacity.

**B.    ALJ's Credibility Analysis**

In evaluating a claimant's credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Second, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility by setting forth clear and convincing reasons for rejecting his subjective complaints. *Id.* at 1036; *see also Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).

Factors that may be considered by an ALJ in assessing a claimant's credibility include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (an ALJ may consider a claimant's reputation for truthfulness, inconsistencies between a claimant's testimony and conduct, and a claimant's daily activities when weighing the claimant's credibility).

Plaintiff asserts the ALJ did not properly perform the credibility analysis.  (Doc. 17 at 6). According to Plaintiff, "the ALJ simply sets forth the oft rejected boilerplate language numerous courts have rejected as boilerplate."  (*Id.* at 7, citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)). In addition, Plaintiff argues, "it appears that the ALJ simply rejects Gallegos' testimony based on a belief that the testimony is not credible because it lacks support in the objective medical evidence." (*Id.*)  On the other hand, Defendant argues the ALJ properly considered many factors—including factors not acknowledged or challenged by Plaintiff— to evaluate his credibility.  (Doc. 22 at 13-20)

Specifically, in evaluating Plaintiff's credibility, the ALJ determined Plaintiff's "impairments could reasonably be expected to cause the alleged symptoms, and his statements concerning the

limiting effects of these symptoms are generally credible." (Doc. 10-3 at 16) The ALJ continued: "Although the claimant has alleged difficulty sitting, standing, and walking for long periods of time, … he has not alleged symptoms and limitations that would preclude performance of all work." (*Id.*) The ALJ opined Plaintiff's daily activities, treatment received, effectiveness of the treatment, and medical record did not support a conclusion that Plaintiff was precluded from work. (*Id.* at 17-20) Further, the ALJ observed that Plaintiff expressed an intent to work if his application for Social Security was denied. (*Id.* at 20)

       1.      Use of "boilerplate" language

In *Bjornson v. Astrue*, as Plaintiff observes, the Seventh Circuit criticized ALJs who include the following language in their decisions: "[A]fter considering the evidence of record, the undersigned finds that claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.*, 671 F.3d at 645. The court explained this was "meaningless boilerplate" because "[t]he statement by a trier of fact that a witness's testimony is 'not *entirely* credible' yields no clue to what weight the trier of fact gave the testimony. *Id.* (quoting *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (emphasis in original)). Further, the court explained: "Such boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Id.* (citation omitted).

Likewise, the Ninth Circuit recently criticized ALJs who rejected a claimant's "testimony regarding the intensity, persistence, and limiting effects of his symptoms to the extent that testimony was 'inconsistent with the above residual functional capacity assessment.'" *See Laborin v. Berryhill*, 867 F.3d 1151, 1154 (9th Cir. 2017). The Court explained "this boilerplate language is problematic" and "subverts the way an RFC must be determined relying on credible evidence, including testimony." *Id.* (citing *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012)) As a result, the Ninth Circuit determined "inclusion of [the] flawed boilerplate language" "does not …add anything to the ALJ's determination." *Id.*, 867 F.3d at 1154-55. Thus, where an ALJ includes *only* boilerplate language, the analysis is insufficient to support the ALJ's conclusions. *Id.* at 1155.

Importantly, here, the ALJ did not include the language identified as boilerplate by either the

16

Ninth Circuit or the Seventh Circuit. Rather than finding Plaintiff's statements were "not entirely credible," the ALJ found his "statements concerning the limiting effects of these symptoms *are generally credible*." (Doc. 10-3 at 16, emphasis added). Further, the ALJ did not merely reject Plaintiff's testimony as inconsistent with the residual functional capacity she identified, she addressed several factors as discussed below. Consequently, the Court finds the ALJ did not err by relying on boilerplate language in the decision.

### 2. Objective medical evidence

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"). Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to simply state that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify "what evidence suggests the complaints are not credible").

The ALJ determined that "[t]he positive objective clinical and diagnostic findings since the alleged onset date… do not support more restrictive functional limitations than those assessed." (Doc. 10-3 at 17) The ALJ noted that Plaintiff testified that he had difficulty with his hands and that he

"drops things such as a cup or toothbrush." (*Id.* at 16)  The ALJ noted Plaintiff was diagnosed with tendinitis in 2012 and carpal tunnel syndrome in 2013.  (*Id.* at 14)  However, the ALJ noted that after the diagnosis, Plaintiff "received no further treatment, and there [was] no objective or opinion evidence to show significant limitations resulting from this condition." (*Id.* at 14-15)  Further, the ALJ observed that Plaintiff's carpal tunnel syndrome "should be amenable to proper control by adherence to recommended medical management and medication compliance." (*Id.* at 15)  Therefore, the ALJ concluded the objective medical record demonstrated Plaintiff's "bilateral carpal tunnel syndrome [was] non-severe." (*Id.*)

In addition, the ALJ noted that Plaintiff testified he had difficulty sitting, standing, and walking; and he had "pain when getting out of bed or getting in and out of the car." (Doc. 10-3 at 16) Plaintiff said he "use[d] a cane once a month…, but acknowledged it was not prescribed." (*Id.*)  However, the ALJ observed that while Plaintiff had "sporadic positive straight leg raising testing," his "ambulation was not limited and his gait was normal." (*Id.* at 20) (citing Exh. 11F pp. 3, 6, 9, 12, 14, 23 [Doc. 10-10 at 4, 7, 10, 13, 15, 24])  For example, the ALJ found treatment notes indicated that Plaintiff's "straight leg raise test was positive to about sixty degrees, but he had a normal gait" on October 5, 2013. (*Id.*) Further, the ALJ found: "The examinations also consistently reported that the claimant appeared to walk normally, was able to climb on and off the examination table, and was able to recline and sit without assistance." (*Id.*, citing Exh. 8F pp 10, 13, 15 [Doc. 10-9 at 73, 76, 78]; Exh. 11F pp. 3, 6, 15 [Doc. 10-10 at 4, 7, 16])  As noted by the ALJ, during a neurosurgical consultation, Dr. Waldau concluded that Plaintiff had "full strength and sensation" and "a normal gait." (*Id.* at 18)  Finally, the ALJ found "no objective evidence that … [Plaintiff] needs the use of a can to ambulate." (*Id.* at 21)

Because the ALJ identified inconsistencies between the medical record and Plaintiff's testimony concerning the extent of his limitations, the objective medical record supports the adverse credibility determination.  *See Greger*, 464 F.3d at 972; *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (an ALJ may consider "contradictions between claimant's testimony and the relevant medical evidence").

### 3.     Plaintiff's level of activity

A claimant's ability to cook, clean, do laundry and manage finances may be sufficient to

support an adverse finding of credibility.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (the claimant's activities "suggest she is quite functional.  She is able to care for her own personal needs, cook, clean and shop.  She interacts with her nephew and boyfriend.  She is able to manage her own finances...").  Likewise, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant exercises, and participates in community activities.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

The ALJ determined that Plaintiff "described daily activities that are not limited to the extent one expect, given the complaints of disabling symptoms and limitations."  (Doc. 10-3 at 17)  The ALJ noted Plaintiff was "able to shower independently, wash dishes, change his children's diapers and clothes, and go shopping with his wife."  (Doc. 10-3 at 16-17)  In addition, the ALJ noted that Plaintiff said he Plaintiff drove to his doctor's appointments and "acknowledged that he goes to church every Sunday and Friday for one-and-a-half hours." (*Id.*)  The ALJ concluded the "ability to participate in such activities suggests that his functional limitations are not as severe as he has alleged."  (*Id.* at 17)  Because Plaintiff retained the ability to perform his activities of daily living—despite the allegations of disabling back pain and limits using his hands— his level of activity supports the determination that his impairments were not as disabling as Plaintiff alleged.  *See Stubbs-Danielson,* 539 F.3d at 1175; *Burch*, 400 F.3d at 681; *see also Molina v. Astrue,* 674 F.3d 1104, 1113 (9th Cir. 2012) ("Even where … activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment").

### 4.  Treatment received

When assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. §§ 404.1529(c), 416.929(c).  Here, the ALJ determined that "although the claimant has received treatment for the allegedly disabling symptoms, the record also reveals that the conservative treatment has been generally successful in controlling those symptoms." (Doc. 10-3 at 20)

#### a.  *Conservative treatment*

The treatment a claimant received, especially when conservative, is a legitimate consideration in

a credibility finding. *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("Evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment"); *see also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged).

Plaintiff contends the ALJ's credibility analysis was flawed because the ALJ erred in characterizing his treatment as conservative. (Doc. 17 at 10) According to Plaintiff, "The ALJ's reason to reject Gallegos, that [his] treatment is routine and conservative, fails because the record establishes Gallegos has had epidurals without relief and ingests potent narcotic pain medications." (*Id.*) Plaintiff observes the Central District court determined "[n]arcotic medications are not a form of conservative treatment" and "[i]njections for pain management are not a form of conservative treatment." (*Id.*, citing *Tunstell v. Astrue*, 2012 WL 3765139, at *4 (C.D. Cal. 2012); *Nevins v. Astrue*, 2011 WL 6103057, at *5 (C.D. Cal. 2011); *Oldham v. Astrue*, 2010 WL 2850770 (C.D. Cal. 2010)). Further, Plaintiff contends: "there is no cure for fibromyalgia" and "there is no evidence that any particular course of treatment would have alleviated plaintiff's symptoms." (*Id.* at 11)

On the other hand, Defendant observes that "Plaintiff <u>does not have fibromyalgia</u> – he has degenerative changes in his spine," and argues the treatment Plaintiff received for his back was conservative, "consisting mainly of physical therapy, anti-inflammatory and narcotic medication and a TENS unit." (Doc. 22 at 16, emphasis in original) The Commissioner contends the Central District court has also issued decisions in which narcotics and a TENS unit were characterized as conservative treatment. (*Id.* at 17, citing *Ferguson v. Berryhill*, 2017 WL 2927148, *4 (C.D. Cal. July 7, 2017); *Morris v. Colvin*, 2014 WL 2547599, *4 (C.D. Cal. June 3, 2014)) Further, Defendant observes: "the Ninth Circuit has found in an unpublished memorandum that an ALJ properly discounted a claimant's pain allegations by citing 'evidence of [the] conservative treatment plan, which consisted primarily of minimal medication, limited injections, physical therapy, and gentle exercise.'" *Id.* (quoting *Hanes v. Colvin*, 651 Fed. Appx. 703, 705 (9th Cir. 2016))

As the parties observe, the record indicates Plaintiff was treated with a TENS unit, physical therapy, nonsteroidal anti-inflammatories, muscle relaxants, and "injections from a pain specialist."

(*See* Doc. 10-3 at 18-19). Significantly, the Ninth Circuit indicated that the court had "doubt[s] that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment." *Garrison v. Colvin*, 759 F.3d 995, 1015 n.20 (9th Cir. 2014). In addition, the Ninth Circuit has criticized an ALJ for characterizing treatment as "conservative" where the claimant's treatment included "copious amounts of narcotic pain medication as well as occipital nerve blocks and trigger point injections," as well as cervical fusion surgery. *Lapeirre-Gutt v. Astrue*, 382 Fed. App'x. 662, 664 (9th Cir. 2010) (comparing the facts presented to those in *Carmickle v. Comm'r*, 533 F.3d 1155, 1162 (9th Cir. 2008), where the ALJ found claimant's treatment to be conservative where claimant took only Ibuprofen to treat his pain)).

Despite this, "courts have frequently found that the fact that Plaintiff has been prescribed narcotic medication or received injections does not negate the reasonableness of the ALJ's finding that Plaintiff's treatment *as a whole* was conservative, particularly when undertaken in addition to other, less invasive treatment methods." *Martin v. Colvin*, 2017 WL 615196, at *11 (E.D. Cal. Feb. 14, 2017) (emphasis in original) (citing, e.g., *Huizar v. Comm'r*, 428 Fed. Appx. 678, 680 (9th Cir. 2011); *Traynor v. Colvin*, 2014 WL 4792593, at *9 (E.D. Cal. Sept. 24, 2014); *Jones v. Comm'r of Soc. Sec*, 2014 WL 228590, at *7-10 (E.D. Cal. Jan. 21, 2014); *Zaldana v. Colvin*, 2014 WL 4929023, at *2 (CD. Cal. Oct. 1, 2014)). Though Plaintiff was treated with a nerve block injections for his back pain, he was also discharged from pain management treatment "due to the effectiveness of [the] injections," and continued treatment with medication and physical therapy. (Doc. 10-3 at 17-19) In addition, Plaintiff did not receive treatment beyond medication for his carpal tunnel syndrome. (*Id.* at 16) Accordingly, the Court finds the record supports the conclusion that Plaintiff's treatment—as a whole—was conservative in nature.

### b. *Effectiveness of the treatment*

Regardless of whether the treatment Plaintiff received was "conservative," the ALJ also found Plaintiff's symptoms were "amenable to… treatment." (Doc. 10-3 at 18) Importantly, when an impairment "can be controlled effectively with medication," it cannot be considered disabling. *Warre v. Comm'r of Soc. Sec. Admin*., 439 F.3d 1001, 1006 (9th Cir. 2006).

Plaintiff does not challenge, or even acknowledge, the ALJ's findings that his treatment was

effective. (*See generally* Doc. 17 at 3-12) The ALJ noted, in May 2013, "Dr. Grandhe remarked that the claimant had [a] good response to the diagnostic bilateral lumbar facet joint block." (Doc. 10-3 at 19) In addition, she observed that in September 203, "Dr. Grandhe stated that the claimant had good and continued relief with reduced pain." (*Id.*) Plaintiff was discharged from pain management in November 2013 "due to the effectiveness of [the] injections." (*Id.*) Further, the ALJ observed that when Plaintiff had physical therapy, he stated "things were going fine," and he "started feeling better with decreased pain from an eight to a five of ten, indicating increased tolerance for therapeutic exercise and a good response to physical therapy." (*Id.* at 17, 19) Further, the ALJ found "clinic treatment notes from Mr. Tiyaamornwong also show that the claimant's conservative treatment was effective" because Plaintiff reported his pain had "'gotten a lot better' and his epidural injections 'helped greatly.'" (*Id.* at 19)

Where such treatments such as those Plaintiff received are effective, such the ALJ's findings regarding the effectiveness of treatment support an adverse credibility determination. *See Jones,* 2014 WL 228590, at *7-10 (the ALJ properly found that plaintiff's treatment—physical therapy, anti-inflammatory and narcotic medications, use of a TENS unit, occasional epidural steroid injections, and massage therapy—diminished the plaintiff's credibility); *Traynor*, 2014 WL 4792593, at *9 (evidence that the claimant's symptoms were managed with "prescription medications and infrequent epidural and cortisone injections" was sufficient for the ALJ to discount the plaintiff's testimony regarding the severity of impairment). Accordingly, the Court finds the effectiveness of the treatment, which was not challenged by Plaintiff, supports the adverse credibility determination.

### 5. Intent to work

The ALJ noted that in December 2013, "the claimant stated that he was doing 'okay' and 'considering going back to work if he [was] denied social security.'" (Doc. 10-3 at 20) (quoting Exh. 11F, p. 2 [Doc. 10-10 at 3]) The ALJ concluded, "This statement indicates the claimant's impairments do not prevent him from work; instead, he would only return to work if he …did not receive another source of income." (*Id.*)

Importantly, "[i]t is permissible for the ALJ to consider the totality of the claimant's testimony, especially testimony that indicates that the claimant is willing to and thinks he is able to engage in some

types of work that contradict his application for disability benefits." *Phillips v. Colvin*, 61 F.Supp.3d 925, 944 (N.D. Cal. 2014). Thus, as Defendant argues, "The ALJ could rely on Plaintiff's expressed interest in working, while simultaneously claiming to be disabled, as a reason to discount his allegations of greater limitations." (Doc. 22 at 14, citing *Bray v. Astrue*, 554 F.3d 1219, 1227 (9th Cir. 2009)). Because Plaintiff expressed an intent to work if his application for Social Security benefits was denied, the ALJ's consideration of this statement as part of the credibility determination was proper.

## <u>CONCLUSION AND ORDER</u>

The ALJ properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. Because the ALJ applied the proper legal standards, the determination that Plaintiff is not disabled must be upheld by the Court. *Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and

2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Nancy Berryhill, Acting Commissioner of Social Security, and against Plaintiff Andrew Gallegos.

IT IS SO ORDERED.

Dated: __August 15, 2018__                    _____/s/ Jennifer L. Thurston_
                                                UNITED STATES MAGISTRATE JUDGE